IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ANALEE RUPP and BLAIR RUPP, <br><br>     Plaintiffs & Counterclaim Defendants, <br><br>     vs. <br><br> TRANSCONTINENTAL INSURANCE COMPANY; AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA; CONTINENTAL CASUALTY COMPANY; and CNA INSURANCE COMPANY LIMITED, <br><br>     Defendants & Counterclaimants. <br><br> _____ <br><br> AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA; and CONTINENTAL CASUALTY COMPANY, <br><br>     Third-Party Plaintiffs, <br><br>     vs. <br><br> GRANITE CONSTRUCTION INCORPORATED; and WESTCHESTER FIRE INSURANCE COMPANY, <br><br>     Third-Party Defendants. | **ORDER AND** <br><br> **MEMORANDUM DECISION** <br><br><br> Case No. 2:07-CV-333-TC |

In this third-party liability insurance coverage action,[1] Plaintiffs Analee and Blair Rupp,

as assignees of the insured Granite Construction Inc. ("Granite") and excess insurer Westchester

Fire Insurance Company ("Westchester"), allege claims against the primary insurance companies

_____

[1] "[A] 'third-party' situation is one where the insurer contracts to defend the insured against claims made by third parties against the insured and to pay any resulting liability, up to the specified dollar limit."  Beck v. Farmers Ins. Exch., 701 P.2d 795, 798 n.2 (Utah 1985).

for breach of various fiduciary duties, including a claim for bad faith refusal to settle an underlying personal injury lawsuit.

Defendants American Casualty Company of Reading, Pennsylvania ("American") and Continental Casualty Company ("Continental") have filed a Motion for Summary Judgment seeking dismissal of all of Plaintiffs' claims.  They contend that the insurance policies' terms and conditions bar recovery because the insurers did not consent to the settlement agreement between the Rupps, Granite, and Westchester, and because the underlying action never went to trial.  They further contend that Westchester had no legally enforceable right of recovery to assign to the Rupps.[2]  Alternatively, they contend that any liability they may have is limited to Granite's out-of-pocket loss (i.e., the amount Granite paid in excess of its deductible).

For the reasons set forth below, the court holds that American and Continental are not entitled to summary judgment.  The Rupps' claims do not fail as a matter of Utah law and genuine disputes of material fact exist regarding the Rupps' allegation of a breach of fiduciary duties and regarding the insurance companies' allegation of a collusive, bad faith settlement and

--------

[2]Defendants Transcontinental Insurance Company's ("Transcontinental") and CNA Insurance Company Limited's ("CNA") also filed a Motion to Dismiss the Plaintiffs' claims without prejudice (see Dkt # 27) on the basis that allegations in the Amended Complaint do not establish that Transcontinental and CNA were insurers of Granite.  For the reasons set forth during the court's September 18, 2008 hearing on the motion, the court granted this motion from the bench.  (See Tr. of Sep. 18, 2008 Hrg. on Mots. (Dkt. # 108) at 3-6.)  At the same time, the court, at American's and Continental's request, agreed to strike the portions of the affidavit of Plaintiffs' expert witness Paul Brenkman that contained improper legal conclusions and statements that would not be helpful to the court in determining whether to grant the motion for summary judgment.  (Id. at 6.)  In this order, that ruling is clarified (e.g., the court does not strike the documents attached to Mr. Brenkman's affidavit).  And, finally, the court denied the Plaintiffs' Rule 56(f) motion for discovery (see Rule 56(f) Aff. of David R. Olsen, Esq. (Dkt # 89)) on the basis that discovery was not necessary to fairly determine the choice of law issue or the merits of the motion for summary judgment.  (Id. at 6-7.)

judgment.  Accordingly, American's and Continental's Motion for Summary Judgment is DENIED.

## I.  FACTUAL BACKGROUND[3]

Plaintiff Analee Rupp and her husband Blair Rupp bring this suit as assignees of Granite and Westchester to recover damages for breach of various fiduciary and equitable duties (including failure to fairly evaluate the claim and bad faith refusal to accept reasonable settlement offer within policy limits) that the insurance companies allegedly owed to Granite and Westchester.

In May 2003, Ms. Rupp was severely injured during a car accident in a construction zone on Interstate-15 in Utah (she is now a quadriplegic).  In November 2004, the Rupps brought a personal injury suit (the "underlying action") in Utah state court against Granite's wholly-owned subsidiary Granite Construction Company of Utah ("Granite of Utah") and Granite of Utah's subcontractor, Riley Transportation Consultants, Inc. ("Riley") (a Utah corporation).  The Rupps blamed, at least in part, Granite of Utah's and Riley's allegedly negligent design of the traffic control plan for the construction project.[4]  In the underlying action, the Rupps sought general, special, and, later in the litigation, punitive damages.

At the time of the accident, Granite had three commercial general liability insurance

---

[3]The facts are taken from the parties' briefs and evidentiary material.  Where disputes of material fact exist, the court will identify them.  Because the Rupps are the non-moving parties, the court lays out the facts and all reasonable inferences from those facts in the light most favorable to the Rupps.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986);  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).

[4]Riley is not a party to this suit.

policies: the policy issued by American, which provided $2 million in primary coverage (Granite had a $500,000 per-occurrence deductible); the policy issued by Continental, which provided $2 million in umbrella[5] coverage; and an excess[6] policy issued by Westchester, which provided $11 million in coverage (with a $500,000 per-occurrence deductible) in excess of the $4 million coverage provided by American and Continental combined.  Those policies apparently covered Granite of Utah.[7]

Based on the coverage Granite had, a jury verdict awarding more than $15 million in general and special damages would constitute an excess judgment.  Also important is the fact that none of the policies provided coverage for punitive damages liability.

---

[5]An umbrella policy widens the scope of coverage of the primary insurance policy. Benjamin v. Amica Mut. Ins. Co., 140 P.3d 1210, 1217 (Utah 2006).

[6]An excess policy "increases the amount of coverage available to compensate for a loss." Id. (internal quotation marks and citation omitted).

[7]The Plaintiffs requested additional discovery in part to determine whether the two policies were indeed issued by American and Continental.  They contend that the record is not clear, and they point to the declaration page of the American Policy and correspondence in which the claims manager uses the names of the insurance company defendants inconsistently.  For example, on the declaration page of the American Policy (Policy No. GL 1 89156689) is a box labeled "CC" that is checked to identify which company under the CNA network of insurance companies actually provided the insurance.  Plaintiffs contend that "CC" means "Continental Casualty," not "American Casualty."  To support their contention, they note that on the same page, another box labeled "AC" (allegedly meaning "American Casualty") is not marked.  But claims manager Melody Taylor states in her declaration that the policy was indeed issued by American Casualty.  (Decl. of Melody L. Taylor ¶¶ 5-6.)  These apparent discrepancies in the record do not sufficiently dispute Ms. Taylor's sworn representation that American issued the policy, at least for purposes of summary judgment.  Moreover, the factual issue is not material to the court's ruling today.  Accordingly, no Rule 56(f) discovery is necessary and, as the court noted during the hearing, Plaintiffs' Rule 56(f) motion for stay and discovery is denied.  The court also notes that the Settlement Agreement (the contents of which Plaintiffs do not dispute) states in its "Recitals" that the policies were issued as described by Ms. Taylor in her Declaration.  (See Settlement Agreement Recitals ¶ B (attached as Ex. A to Defs.' Mem. Supp. Mot. Summ. J.).)

A.     **Policy Language**

   1.     **The American Policy**

   The American Policy's coverage form contains the following relevant language:

   We will pay those sums that the insured becomes legally obligated to pay because of "bodily injury" . . . to which this insurance applies.  We will have the right and duty to defend the insured against any suit seeking those damages.

(American Policy § I(1)(a) (Bates No. AC0078), attached as Ex. 1 to Decl. of Melody L. Taylor.)

It also provides that in the event of a claim by a third party, Granite:

   must cooperate with us in the investigation or settlement of the claim or defense against the "suit"[.]

(Id. § IV(2)(c)(3) (Bates No. AC086).)  Furthermore:

   No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, . . . without our consent.

(Id. § IV(2)(d).)

   2.     **The Continental Policy**

   The umbrella policy issued by Continental contains similar language:

   We will pay on behalf of the insured those sums . . . that the insured becomes legally obligated to pay as "ultimate net loss" because of . . . "Bodily injury" . . . to which this insurance applies.

(Continental Policy § I(1)(a) (Bates No. AC0136), attached as Ex. 2 to Taylor Decl.)  The

Continental Policy defines "ultimate net loss" as

   the actual damages the insured is legally obligated to pay, either through: (1) Final adjudication on the merits; or (2) Through compromise settlement with our written consent or direction[.]

(Id. § V(18)(a) (Bates No. AC0146).)  Consistent with the definition of "ultimate net loss," the

"Conditions" section of the Continental Policy's "Commercial Umbrella Plus Coverage Part"

5

contains the following language (which is not in the American Policy):

> No legal action shall be brought against us unless you have fully complied with all the terms of this policy and the amount of your obligation to pay has been finally determined either by:
>
> > a.      Judgment against you after actual trial; or
> >
> > b.      Written agreement between us, you and the claimant.

(Id. § IV(3) (Bates No. AC0141).)  (The court refers to this as the "no legal action" or "legal action limitation" provision.)  And, finally, in the policy, Continental assigns to itself "the sole right to make settlement of a 'suit' as we deem expedient."  (Id. § VI(4) (Bates No. AC0147).)

## B.      Defense Against the Underlying Action and Settlement Negotiations

American and Continental agreed to defend Granite of Utah in the underlying action, and Granite hired Utah lawyer Daniel McConkie to defend it in the underlying action.

In July 2005, Melody Taylor of CNA Claim Plus, Inc. (the claims manager for American and Continental) wrote to Granite advising it to increase its reserve fund from $425,000 to $1 million and put the umbrella insurer (Continental) on notice because the case could result in a potential verdict of $10-12 million, with a settlement range of $5-6 million.

In July 2006, Mr. McConkie, Granite's counsel, told Granite and Ms. Taylor that "[i]t would be highly unlikely that a jury would give the plaintiff 50% fault or greater, thus leaving her nothing at the end of the day."  (July 12, 2006 e-mail from McConkie to Taylor et al. (attached as Ex. 2 to Aff. of Paul Brenkman).)[8]

---

[8]Although the court granted the motion to strike the objectionable statements in Mr. Brenkman's affidavit, the documents attached to the affidavit remain in the record.  The court holds that Mr. McConkie's email is, despite the insurers' hearsay objection, admissible.  The email is not being offered for the truth of the matter asserted.  Instead, it is admissible as

In August 2006, the trial court in the underlying action allowed the Rupps to amend their complaint to assert a claim against Granite of Utah for punitive damages.

In October 2006, the first mediation failed when the insurers offered less than $1 million to settle the case.

In February 2007, CNA Claim Plus contacted attorney Donald Dawson Jr. to assist Mr. McConkie at trial.  Mr. Dawson evaluated the case and concluded there was a 60% chance of a defense verdict, but he acknowledged that the remaining 40% was left to many intangibles at trial.  He concluded that "[i]n the event of an adverse verdict, the likely compensatory damages range is $10-$15 million (although a higher amount cannot be ruled out)."  (Feb. 27, 2007 Letter from Dawson to Taylor (attached as Ex. 2 to Brenkman Aff.) at 1-2, ¶¶ 1-4.)[9]  He added that an offset for comparative fault could reduce the total verdict range "to $4 to $8 million."  (Id.)  He thought it unlikely that punitive damages would be awarded or that, if they were awarded, they "would exceed $10 million."  (Id.)  He added, "It is possible any punitive thoughts on the part of the jury would be folded into a higher compensatory verdict, which may take the upper end of that range to $20 million."  (Id.)  Despite his valuations, Mr. Dawson told CNA Claim Plus: "The settlement value of this case at this time is $1.5 to $2 million," and he added that "a reasonable

_____

evidence that the insurers received this opinion during their evaluation of whether to accept the Plaintiffs' settlement offers, and as evidence showing the basis for Granite of Utah's belief that it faced exposure to an excess judgment and that settlement was necessary to protect its interests. See, e.g., Ferguson v. United States, 484 F.3d 1068, 1074 (8th Cir. 2007) (spreadsheet showing calculations of tax liability was not hearsay, because it was admitted to show what IRS relied on in making its tax assessment, not to prove accuracy of calculations); Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1434 (10th Cir. 1993) ("Statements offered for the effect on the listener . . . are generally not hearsay.").

[9]This document is admissible as non-hearsay for the same reasons set forth in footnote 8, supra.

7

settlement could be obtained after opening statement, or after the first few witnesses, if the client does not wish to go to verdict."  (Id.)

On March 2, 2007, Mr. McConkie responded to Mr. Dawson's valuation.  He agreed that the case value was probably $10-$15 million (including approximately $8 million in special damages), but he opined that the chance of a favorable verdict was 30%, not 60%.  (Mar. 2, 2007 email from McConkie to Granite et al. (attached as Ex. 2 to Brenkman Aff.).)[10]  Based on his experience with the plaintiffs' counsel, he was of the "firm opinion" that the plaintiffs "will NOT settle this case" at the courthouse steps or during trial.  (Id. at 2.)  He concluded that the settlement value of the case was between $5-$6 million.

On March 5, 2007, a second mediation was held, where American and Continental offered no more than $1.5 million to settle the case.  The mediation failed, as Mr. McConkie had predicted.

One day later, on March 6, 2007, the Rupps demanded $12 million to settle the case.  The insurers rejected the offer, noting their belief that Granite of Utah was not legally liable to the Rupps.  On March 12, 2007, Mr. Dawson reiterated his opinion that the settlement value of the case was less than $2 million, but he stated that his opinion was "premised on the assumption I would be lead trial counsel."  (Mar. 12, 2007 Letter from Dawson to Granite (attached as Ex. 2 to Brenkman Aff.).)[11]  He did acknowledge, however, that "there is a risk of a high verdict here if things do not go well at trial and a small risk of punitive damages."  (Id.)

---

[10]This document is admissible as non-hearsay for the same reasons set forth in footnote 8, supra.

[11]This document is admissible as non-hearsay for the same reasons set forth in footnote 8, supra.

On March 16, 2007, Granite forwarded the Rupps' new settlement offer of $6 million to the insurers, demanding that they tender the full amount of the policy limits (i.e., $4 million) and noting that Westchester would supply the remaining $2 million.  The offer, which was to expire on March 26, 2007, also required Granite to pay its $500,000 deductible.  (See Mar. 16, 2007 email from Wallach to Taylor et al. (attached as Ex. E to Olsen Aff.); Mar. 20, 2007 Letter from Westchester to CNA Claim Plus (attached as Ex. 10 to Pls. Mem. Opp'n Mot. Summ. J.).)

On March 20, 2007, Westchester wrote to CNA Claim Plus.  Based on its evaluation of "the issues and exposure to the insured in this case, as well as defense counsel's and the mediator's settlement recommendations, together with the insured's request that this offer be accepted," Westchester demanded that American and Continental tender their combined $4 million policy limit, and it offered to pay the $2 million above the underlying coverage, making the $6 million settlement offer in effect a policy-limits offer for American and Continental. (Mar. 20, 2007 Letter from Thomas Thornburgh, Westchester, to Taylor (attached as Ex. 10 to Pls.' Mem. Opp'n Mot. Summ. J.).)

On March 23, 2007, the insurers rejected the policy-limits offer.

Granite then hired attorney Stephen J. Trayner to evaluate the case and give his independent assessment of Granite's exposure at trial.  Mr. Trayner concluded that the case had a likely verdict range of $12.5-$15 million.  He thought the likelihood of punitive damages was not high, but if they were awarded, the potential punitive damage exposure "could be up to nine times $12,000,000, or more than $100,000,000."  (Mar. 28, 2007 Letter from Trayner to Granite

(attached as Ex. 2 to Brenkman Aff.).)[12]  He based his evaluation on a Utah Supreme Court opinion that allowed a ratio of punitive damages to compensatory damages equaling nine to one.[13]  He concluded that the eventual verdict would exceed $6 million, and he recommended that Granite settle the case for the current offer.

At that point, Granite forwarded Mr. Trayner's case evaluation to CNA Claim Plus and notified American and Continental in writing that it believed they had breached their fiduciary duties by refusing to accept a reasonable settlement offer within the policy limits in light of respectable opinions that an excess judgment was likely.  Granite also stated that it would do whatever was needed to avoid an excess judgment for general and special damages and to avoid punitive damage liability (which was undisputedly not covered by insurance).  (See Mar. 28, 2007 Letter from Granite to CNA Claim Plus (attached as Ex. F to Olsen Aff.).)

Even though the $6 million settlement offer had expired, the Rupps agreed to renew the offer.  Westchester again offered its $2 million.  Granite again urged the insurers to accept the settlement offer, re-emphasizing Mr. Trayner's opinion and stating, "If you disagree with Trayn[e]r's opinion please provide your factual damage analysis to support [American's and Continental's] decision on the case value.  If not please tender [the insurers'] policy limits towards the settlement of Rupp v. Granite litigation."  (Apr. 4, 2007 e-mail from Granite to Taylor (attached as Ex. D to Olsen Aff.).)

_____

[12]This document is admissible as non-hearsay for the same reasons set forth in footnote 8, supra.

[13]See Campbell v. State Farm Mut. Auto. Ins. Co., 65 P.3d 1134 (Utah 2001).  The holding concerning punitive damages was later overturned by the U.S. Supreme Court in State Farm Mut. Auto. Ins. Co., v. Campbell, 538 U.S. 408 (2003).

The insurers again refused to tender the $4 million policy limit.

As the June 2007 trial date neared (after the insurers had rejected two offers to settle within the policy limit despite repeated requests, advice and case evaluations from Granite, Westchester, and their experts and attorneys (except Mr. Dawson, whose valuation was premised on his trying the case as first chair)), the Rupps, Granite, Granite of Utah, and Westchester decided to enter into a settlement agreement without American and Continental.  (See Apr. 27, 2007 Settlement Agreement And General Release ("Settlement Agreement") (attached as Ex. A to Mem. Supp. Mot. Summ. J.).

**C.**      **Terms of the Settlement Agreement**

The Settlement Agreement, dated April 24, 2007, set forth terms reached after negotiations involving the Rupps, Granite, Westchester, their attorneys, and a mediator.  Based on the Mediator's Term Sheet, which was incorporated into the Settlement Agreement, the settling parties agreed that $8 million was the reasonable settlement value of the underlying action.  (See Settlement Agreement Recitals ¶ F & Covenants ¶ 3.)  The Settlement Agreement was "deemed to have been executed and delivered within the State of Utah" and the settling parties agreed that it would be governed by Utah law without regard to any conflict of laws.  (Id. Covenants ¶ 20.)

In the settlement, Granite agreed to pay the Rupps $700,000, and Westchester agreed to pay the Rupps $2.3 million, for a total payment of $3 million.  Granite and Westchester also assigned to the Rupps any claims they might have against American and Continental relating to

the insurance companies' handling of Granite's claim under the two policies.[14]

In exchange, the Rupps agreed to a Covenant Not to Execute, which provides that

> under no circumstances will the [$8 million] Judgment be enforced against the
> assets of Granite Construction of Utah or Granite Construction Incorporated, or
> against the assets of Westchester . . . .  The Rupps agree that under no
> circumstances will the Judgment ever be recorded in any form in any forum or
> venue, or executed or enforced or used as the basis for garnishment against any
> asset other than the CNA Policies and the assets of CNA.

(Id. Covenants ¶ 4.)  The Rupps also agreed to dismiss their punitive damages claim against

Granite of Utah, and they generally released Westchester and Granite from any obligations

relating to the events at issue in the underlying action (Granite released Westchester as well).

(Id. Covenants ¶ 8.)

## D.    Entry of a Stipulated Judgment

The case did not go to trial.  Instead, less than two months before trial, the parties to the

Settlement Agreement submitted their "Stipulation and Judgment" to the state court, which

entered the Judgment on April 24, 2007.  The Stipulation stated:

> Plaintiffs Analee and Blair Rupp . . . and Defendant Granite Construction
> Company of Utah and Granite Construction [Inc.] . . . hereby stipulate and agree
> that, in consideration for terms and conditions set forth in a Mediator's Term
> Sheet and settlement documents based thereon, a Judgment may be entered
> against Granite Construction Company of Utah and in favor of the Rupps in the
> total amount of $8,000,000, which sum shall include their recoverable special
> damages, both past and future, general damages, pre-judgment interest, and costs
> of court.  The Rupps agree not to enforce this Judgment against assets of Granite
> Construction [Inc.] or Granite Construction Company of Utah.

---

[14]But Granite and Westchester expressly stated that they made "no express or implied
warranty or promise as to the merits or enforceability of the Assigned Claims" and made no
"express or implied warranty or promise as to the merits or enforceability of the Judgment"
against American and Continental.  (Id. Covenants ¶¶ 4, 5(b), 6(b).)

(Apr. 20, 2007 Stipulation (Dkt # 12-8).)  The accompanying Judgment stated:

> Based upon the foregoing stipulation of the parties, and good cause appearing therefor, it is hereby ORDERED, ADJUDGED AND DECREED that Plaintiffs Analee and Blair Rupp be, and the same are, awarded a <u>Judgment against Defendant Granite Construction Company of Utah in the total amount of $8,000,000</u>, which Judgment shall bear interest at the statutory rate of 6.99% *per annum* until paid and shall not be enforceable against defendant's assets.

(Apr. 24, 2007 Judgment (Dkt # 12-8) (emphasis added).)

Neither American nor Continental was a party to the Settlement Agreement, and they did not learn of the executed Settlement Agreement until Granite notified American and Continental one day after the $8 million Judgment was entered in state court.  (See Apr. 25, 2007 Letter from Granite to CNA Claim Plus (attached as Ex. E to Olsen Aff.).)

The Rupps now seek to enforce the Judgment and the rights assigned to them in the Settlement Agreement.

## II.  ANALYSIS

### A.  Legal Standard

Summary judgment is appropriate if there is "no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When reviewing a motion for summary judgment, the court must "construe the record in the light most favorable to the nonmoving party."  <u>Estate of Larsen ex rel. Sturdivan v. Murr</u>, 511 F.3d 1255, 1259 (10th Cir. 2008).

### B.  Applicable Law

Because this case comes before the court on the basis of diversity jurisdiction, the court must apply the substantive law of Utah, the forum in which it sits, including Utah's choice of law

rules.  Stickley v. State Farm Mut. Auto. Ins. Co., 505 F.3d 1070, 1076 (10th Cir. 2007);  Clark

v. State Farm Mut. Auto. Ins. Co., 433 F.3d 703, 709 (10th Cir. 2005); Littlefield v. Mobil

Exploration & Producing, N. Am., Inc., 988 F. Supp. 1403, 1406 (D. Utah 1996).  In tort

actions,[15] Utah courts apply the "most significant relationship" test to determine which state's

law should apply.  Waddoups v. Amalgamated Sugar Co., 54 P.3d 1054, 1059 (Utah 2002).

The first step is to determine whether a conflict of law exists between the interested

states.  Littlefield, 988 F. Supp. at 1406.  Here, the parties focus on whether a conflict exists

between the laws of California and Utah, and, if so, which state's law applies.  (The American

and Continental insurance policies do not contain a choice of law provision.)  If no conflict

exists, the court may apply Utah's law regardless of which state has the most significant

relationship to the causes of action asserted in the complaint.  Snyder v. Celsius Energy Co., 866

F. Supp. 1349, 1353 n.9 (D. Utah 1994) ("[T]he choice of law question has practical significance

only if the application of one state's law would yield a different result than would the law of

another state.  If no differing result obtains, the court may apply the law of the forum.").

American and Continental contend there is no conflict between Utah and California law,

but if the court finds otherwise, they contend that California has the most significant relationship

to the cause of action.[16]  The court disagrees.  Whether a conflict exists or not, Utah law governs

---

[15]As noted in more detail below, the Plaintiffs' action is a tort, not contract, action.  See Beck v. Farmers Ins. Exch., 701 P.2d 795, 799-800 (Utah 1985) (noting that insurer's breach of third-party insurance contract gives rise to tort liability);  Waddoups v. Amalgamated Sugar Co., 54 P.3d 1054, 1059 (Utah 2002) ("the characterization of an action is made in accordance with the law of the forum").

[16]American and Continental inconsistently claim there is no conflict and then rely primarily on California law to support their position.  (Indeed, the Utah cases they cite are inapposite, as discussed in detail below, and so their argument truly relies on the law of

the case.  If no conflict exists, then the court applies Utah law.  Id.  Assuming a conflict does

exist, the analysis under Utah's choice of law principles favors applying Utah law because the

court finds that Utah has the most significant relationship to the cause of action.

### 1.      Most Significant Relationship – Facts

Utah courts adopted the "most significant relationship" test set forth in the Restatement

(Second) of Conflict of Laws for choice of law analysis in tort cases.  Under this test, the court

should consider the following four factors:

> (a) the place where the injury occurred; (b) the place where the conduct causing
> the injury occurred; (c) the domicil, residence, nationality, place of incorporation
> and place of business of the parties; and (d) the place where the relationship, if
> any, between the parties is centered.

Restatement (Second) Conflict of Laws § 145(2) (1971), quoted in Waddoups, 54 P.3d at 1060.

### a.      Place Where Injury Occurred

The alleged injury occurred in Utah and arose out of a combination of events.  The Rupps

(Utah residents) filed (and litigated) suit in Utah state court against Granite of Utah, demanding

compensatory, special, and punitive damages.  American and Continental allegedly breached

various fiduciary duties owed to Granite of Utah (a Utah-based company with substantial assets

in Utah) after litigation ensued.  American and Continental rejected various settlement offers,

including two offers within the $4 million combined policy limit, either through correspondence

or during two separate mediations that occurred in Utah.  The claims were finally negotiated and

settled in Utah (with the Settlement Agreement stating that Utah law governs regardless of

conflict of law rules).  And the Utah state court entered an $8 million judgment (negotiated in

_____

California.)

Utah) against Granite of Utah.

      b.    <u>Place Where Injurious Conduct Occurred</u>

The settlement negotiations took place (1) in person during two mediations in Utah (which insurance representatives attended and where offers were made and rejected), and (2) through correspondence and telephone conferences between and among representatives of Granite and Granite of Utah, representatives of American and Continental, representatives of the Rupps, and, at some point, Westchester.

      c.    <u>Location of the Parties</u>

American is a Pennsylvania corporation with its principal place of business in Illinois. Continental is an Illinois corporation with its principal place of business in Illinois. CNA Claim Plus, Inc., the entity that represented American and Continental, is a Nevada corporation with its principal place of business in Illinois. The individual representatives of American and Continental included Melody Taylor (based in California), Donald Dawson, Jr., Esq. (based in Michigan), Jordan Howard Ross (based in Phoenix), Donna Rodriguez (based in Colorado), and Karen Campbell (based in Illinois).

Granite Construction Inc. is a California corporation with its principal place of business in California. Granite of Utah, the defendant in the underlying action, is a Utah subsidiary of Granite Construction and has substantial assets in Utah. The representatives of Granite and Granite of Utah included Mike Wallach (based in California), Deborah Jackson (based in California), Deborah Boyd (based in Florida), Daniel McConkie, Esq. (based in Utah), and Steven Trayner, Esq. (based in Utah).

Westchester was represented by Thomas Thornburgh, Esq. (based in Georgia). The

Rupps were represented by David Olsen, Esq. (based in Utah).  And Paul Felt, the mediator, was based in Utah.

              d.      <u>Place Where Relationship Between Parties is Centered</u>

Although the policies may have been issued initially to Granite Construction, Inc. (based in California), the insurance companies are not California companies and the risks covered by the policies spread throughout the United States.

Here, the relevant risk covered by those policies was based in Utah (the construction work occurred in Utah).  Indeed, the contract between Granite of Utah and the Utah Department of Transportation required Granite of Utah to name the State of Utah as an additional insured in a liability policy issued by an insurer authorized to do business in Utah.  (<u>See</u> Rule 56(f) Aff. of David R. Olsen, Esq., ¶ 9; UDOT Contract § 1.14(C) (attached as Ex. B to Olsen Aff.).)

Also, the underlying action was centered in Utah.  For instance, the accident giving rise to the suit and subsequent claim for coverage occurred in Utah; the parties were all Utah residents; the action was filed in a Utah state court (and judgment was entered in that same court); the litigating attorneys were based in Utah; the case was mediated twice in Utah by a Utah mediator (and insurance representatives attended those mediations); and the case was ultimately settled in Utah with a Settlement Agreement that is governed by Utah law and that assigned claims in the action here to Utah residents (the Rupps).

       **2.**        **Most Significant Relationship – Analysis**

Analyzing the above factors, the court finds that the first factor concerning the place where the injury occurred clearly favors Utah.  The second factor—the place where the injurious conduct occurred—weighs only slightly in favor of Utah.  For instance, the written settlement

17

offers originated in Utah, and the mediations, where further refusals occurred, were held in Utah. The refusals to accept settlement offers were articulated by Ms. Taylor in California, and Plaintiffs' undisputed facts suggest that the actual decision communicated by Ms. Taylor was made in Illinois or Maryland by a CNA Claim Plus representative.  Also, many different agents of the insurance companies, spread throughout the United States, contributed to the analysis that led to rejection of the settlement offers.  The third factor—the location of the parties—does not favor either forum because the parties are spread throughout the United States.  The fourth factor, like the first, also clearly favors Utah.

Accordingly, on balance, Utah has the most significant relationship to the cause of action,[17] and the court holds that Utah law applies.

## C.   Americanʼs and Continentalʼs Motion for Summary Judgment

In general, American and Continental contend that Granite of Utah and Westchester had nothing of value to assign, so the Ruppsʼ claims are a nullity, and the insurers are entitled to judgment as a matter of law.

In this case, the Rupps, as assignees of Granite of Utah, seek to enforce the Judgment against American and Continental, alleging that the insurers breached various duties owed to Granite of Utah, which duties arose out of the insurance policies and the fiduciary relationship created by the insurance policies.  The issues in the motion revolve around an insurerʼs duty to

---

[17]The court notes that a California court, in a declaratory judgment action filed by the insurers, ruled that Utah was the preferred forum for determining the issues currently before this court and declared that Utah courts "would have a greater interest [in the case] since the settlement occurred in Utah."  (See Tr. of June 6, 2007 Hrʼg in California Declaratory Judgment Action filed by American and Continental, at p. 8 (attached as Ex.  14 to Pls.ʼ Mem. Oppʼn).)

accept settlement offers within policy limits when there is substantial likelihood of a judgment in excess of the primary insurer's policy limits.  See Campbell v. State Farm Mut. Auto. Ins. Co., 65 P.3d 1134, 1142-43 (Utah 2001), overruled on other grounds, 538 U.S. 408 (2003).  This duty is part of the insurer's overall duty to defend.  See Ammerman v. Farmers Ins. Exch. [hereinafter Ammerman I], 430 P.2d 576, 578-79 (Utah 1967).  The test for bad faith is an objective one and considers whether the insurer's conduct was reasonable under all the circumstances.  Campbell v. State Farm Mut. Auto. Ins. Co., 840 P.2d 130, 138, 138 n.16 (Utah Ct. App. 1992) (noting that this objective test "is consistent with the essentially objective test of good faith conduct in the context of first-party insurance claims, that is, an insurer who denies a claim has acted in 'good faith' so long as the claim was 'fairly debatable.'").  Also, as assignees of excess insurer Westchester, they seek equitable subrogation.

### 1.    American's and Continental's Defenses

Looking at Granite of Utah's claims, American and Continental assert that, as a matter of common law and policy terms and conditions, they are not bound by the Settlement Agreement or Judgment (i.e., they are not legally obligated to pay) because Granite of Utah did not comply with the policy requirement that it obtain consent to settle or, in the alternative, obtain an enforceable judgment through a trial on the merits.  They further contend that the Settlement and Judgment are not a reliable measure of damages in the underlying action because the issue of liability and damages did not go to trial on the merits.

In response, the Rupps contend that the insurers' bad faith refusal to settle within policy limits released Granite from complying with the policies' terms and conditions.  But American and Continental insist there is no evidence of bad faith on their part.  They further assert that the

Settlement Agreement and stipulated Judgment were collusive and reached in bad faith and so are not enforceable.  In the alternative, the insurers contend that any liability they might have to Granite of Utah is limited to $200,000, the amount Granite of Utah actually paid over its $500,000 deductible.

As for Westchester's claims, the insurers contend that Westchester's assignment to the Rupps was premature because the combined policy limit of $4 million was not exhausted, so Westchester had no right to interfere with American's and Continental's defense of the underlying action, including settlement negotiations.  They also contend that Westchester was not harmed by the $8 million Judgment because Westchester paid less than what its liability would have been if the insurers had paid the $4 million combined policy limit.

> **2.**     **Claims of Granite and Granite of Utah**

The central legal issue is whether the "legal action limitation" provision in a liability insurance policy precludes coverage after the insured, who alleges breach of the duty to negotiate and settle in good faith, entered into a settlement without the insurer's consent and agreed to entry of a stipulated judgment without a trial on the merits.

> a.     <u>The Claims Are Based In Tort, Not Contract.</u>

In their briefs, American and Continental treat this case as a contract case.  But that is not a fair characterization of the causes of action brought by the Plaintiffs.  Given the Rupps' allegations, the court finds that their cause of action lies in tort, not contract.  <u>See</u> <u>Beck v. Farmers Ins. Exch.</u>, 701 P.2d 795, 799-801 (Utah 1985) (recognizing in third-party insurance context that insured has tort cause of action against insurer for breach of fiduciary duties); <u>Black v. Allstate Ins. Co.</u>, 100 P.3d 1163, 1170 (Utah 2004) (holding that, although insurer's duty was

contractual before any legal proceedings had been filed against insured, the duty to defend, including the duty to fairly evaluate the case and accept reasonable settlement offers within policy limits, arose at "the commencement of formal legal proceedings against the insured, . . . [because such proceedings could expose the insured] to a judgment and personal liability in excess of the policy limits."); Ammerman I, 430 P.2d at 578 (holding that bad faith cause of action sounds in tort, not contract, and stating that "the cause of action for bad faith, though arising because of the policy, is not, strictly speaking, an action on the policy. Its effect is to override the provision limiting coverage, and it is properly regarded as a separate cause of action for a wrong done to the insured by violating a fiduciary duty owed him.") (emphasis added).

The Utah cases upon which the insurers rely are inapposite and distinguishable because they are contract cases that do not contain allegations of a breach of fiduciary duties.

For instance, American and Continental unpersuasively cite to the decision in University of Utah Hosp. v. American Cas. Co. of Reading, PA, 90 P.3d 654 (Utah Ct. App. 2004), to support their claim that they are not legally obligated to pay the judgment. In University of Utah Hospital, the court held that the malpractice insurance carrier had no duty to defend because the insured (the nurse) never submitted a claim to the insurance company (the nurse was not part of the underlying action and did not face the possibility of personal liability). In so holding, the court interpreted language in the policy that is very similar to language in the two policies at issue here:

> Although "legally obligated to pay" is not explicitly defined in the policy, other provisions of the policy are helpful in interpreting the meaning of "legally obligated to pay." Under the "Legal Action Limitation" provision . . ., the insured may not bring any legal action against [the insurer] until "the amount of your obligation to pay has been decided. Such amount can be set by judgment against

you after actual trial or by written agreement between you, us and the claimant."
When the phrase "legally obligated to pay" is read in conjunction with the "Legal
Action Limitation" provision, we may reasonably conclude that "legally obligated
to pay" occurs via a judgment following an actual trial, or an enforceable
agreement between [the insured, the insurer, and the third-party claimant].

Id. at 657 (internal citation omitted).  In University of Utah Hospital, no party had asserted a bad

faith claim, so the court's analysis focused on contract interpretation issues, not tort issues.  The

court's interpretation of that policy's "legally obligated to pay" provision, which is emphasized

by American and Continental here, does not reach the question of whether a valid claim of bad

faith refusal to settle releases the insured from complying with a "legal action limitation" clause

in the policy, which is what the Rupps contend.

American and Continental also rely on the decision in Freed v. Inland Empire Ins. Co.,

154 F. Supp. 855 (D. Utah 1957), but that case does not contain allegations of bad faith.  Instead,

in a pure contract context, the court generally stated that "[s]ettlement by an assured, without the

previous consent of the insurer, ordinarily releases the insurer."  Id. at 859 (citing Appleman,

Insurance Laws & Practice treatise).  The Freed court's assertion adds little to the analysis

required here.

   b. Determining Utah Law

Utah courts have not ruled on the central legal issue before the court.  Given the lack of

definitive law on the issue, the court must "predict" how the Utah Supreme Court would rule.

Weiss v. United States, 787 F.2d 518, 525 (10th Cir. 1986).  To do so, the court should consider

"intermediate state court decisions, policies underlying the applicable legal principles, and the

doctrinal trends indicated by these policies."  Id.  For example, "[b]oth the holdings and

considered dicta of the State Courts should be applied."  Colorado Visionary Acad. v. Medtronic,

22

Inc., 397 F.3d 867, 871 (10th Cir. 2005).  See also Stuart v. Colorado Interstate Gas Co., 271

F.3d 1221, 1228 (10th Cir. 2001) (in predicting how the state's highest court would rule, "the

federal court is 'free to consider all resources available, including decisions of [the state's]

courts, other state courts and federal courts, in addition to the general weight and trend of

authority'").

Given Utah court decisions on related issues, their emphasis on policy creating

disincentive to an insurer to put its insured at risk for an excess judgment, and their emphasis on

the importance of the fiduciary relationship in the third-party insurance context, the court predicts

that the Utah Supreme Court would hold that the Plaintiffs' claims are not barred as a matter of

law by the voluntary payment and "legal action limitation" conditions of the two policies.  This

approach, which rejects the insurers' position that the insured must obtain a judgment on the

merits through trial before any cause of action for breach of fiduciary duty arises, is also

supported by well-reasoned opinions in other jurisdictions that have addressed the issue and

conclusions in respected insurance treatises.

      c.    Existing Utah Law

In 1967, the Utah Supreme Court, in Ammerman v. Farmers Ins. Exch., 430 P.2d 576

(Utah 1967) [Ammerman I], recognized the tension that arises in the third-party insurance

context between the interests of the insured and the interests of the insurer:

> The covenant in the policy requiring the insurer to defend the insured imposes
> upon it a fiduciary responsibility.  Where there is an offer to compromise a claim
> for less than the policy limit, the acceptance of which would relieve the insured of
> liability, a conflict of interests may exist.  The question then arises as to the extent
> of the duty of the insurance company to safeguard the interest of its insured as
> compared to its own.  It is true that the company cannot properly gamble with or
> sacrifice the insured's interest simply to protect itself.  By the same token it is

neither practical nor reasonable to expect it to subvert its own interests entirely to protect the insured by requiring it to accept any offer below the policy limits, regardless of circumstances, and however questionable the issues of liability and damage may be. . . . [W]e believe that the best view is that it must act in good faith and be as zealous in protecting the interests of its insured as it would in looking after its own.  Whether it discharges that duty may depend on various considerations including the certainty or uncertainty as to the issues of liability, injuries, and damages.

Id. at 578-79 (footnotes omitted) (emphasis added).

Later, in 1985, the Utah Supreme Court, in Beck v. Farmers Ins. Exch., 701 P.2d 795

(Utah 1985), articulated the policy "considerations which compel the recognition of a tort cause

of action in a third-party context":

In a third-party situation, the insurer controls the disposition of claims against its insured, who relinquishes any right to negotiate on his own behalf.  An insurer's failure to act in good faith exposes its insured to a judgment and personal liability in excess of the policy limits.  In essence, the contract itself creates a fiduciary relationship because of the trust and reliance placed in the insurer by its insured. The insured is wholly dependent upon the insurer to see that, in dealing with claims by third parties, the insured's best interests are protected.   . . .

The pragmatic reason for adopting the tort approach is that it exposes insurers to consequential and punitive damages awards in excess of the policy limits.  . . .

[T]he principal reason for the adoption of the tort approach . . . [is to] remove any incentive for breaching the duty of good faith.

Id. at 799-801 (internal citations omitted) (emphasis added).  See also Black v. Allstate Ins. Co.,

100 P.3d 1163, 1169-70 (Utah 2004) ("[B]reach of this [fiduciary] duty to defend may potentially

expose the insurer to consequential and punitive damages awards in excess of policy limits.")

(internal quotations and citations omitted).  These cases demonstrate the importance the Utah

Supreme Court places on protection of an insured's interests.

Although the Utah Supreme Court has not addressed whether breach of the duty to accept

reasonable settlement offers releases the insured from complying with a legal action limitation

provision, it has held that a repudiation of coverage and breach of the duty to defend releases the

insured from terms in a policy requiring the insurer's consent to settlement or obtaining a

judgment only after a trial on the merits.  See, e.g., Benjamin v. Amica Mut. Ins. Co., 140 P.3d

1210, 1216 (Utah 2006) (holding that insurer's breach of the duty to defend estopped the insurer

from "second-guessing [the insured's] decision to settle");  Gibbs M. Smith, Inc. v. United States

Fidelity & Guaranty Co., 949 P.2d 337 (Utah 1997) (holding in third-party context, that insured

who settled suit without consent of insurer after insurer repudiated coverage and denied any duty

to defend, did not forfeit right to coverage despite consent and legal action provisions in policy).

 Perhaps the case nearest to the issue is Campbell v. State Farm Mut. Auto. Ins. Co., 840

P.2d 130 (Utah Ct. App. 1992) [hereinafter Campbell I], to which both parties cite to support

their positions.  Ultimately, Campbell I  is distinguishable because the underlying action in that

case went to trial and resulted in an excess judgment by a jury on the merits of the case.[18]  See id.

at 134.  Also, it is not a Utah Supreme Court decision.  But it is instructive.

 In Campbell I, the Utah Court of Appeals emphasized the Utah Supreme Court's clear

rule that "the heart of the insurer's fiduciary duty, when handling third-party claims against its

insured, is to guard the best interests of the insured as zealously as it would its own.  If the

---

[18]It is similar, though, to this case in at least one way.  One year after the trial against the
Campbells, the parties entered into an agreement in which the plaintiffs in the underlying action
agreed not to execute the judgment on the Campbells' personal assets to satisfy the judgment and
in return, the Campbells promised to pursue a bad faith claim against the insurance company.
Campbell I at 135 n.8.   The parties further agreed that "[t]he fruit of such a claim, if any, was to
be applied first to the expenses of litigation and to satisfy the judgments in favor of [the plaintiffs
in the underlying action].  Any recovery above that amount would be distributed as follows:
[90% to the plaintiffs and 10% to the defendants]."  Id.

insurer's decision to reject offers of settlement and go to trial is unreasonable, it is at that time that the breach of duty occurs, which is the crux of the insured's cause of action for bad faith."

Id. at 140 (emphasis added).  But in a footnote, in dicta, the court added:

> [T]his statement is not inconsistent with our view that the insured's cause of action does not accrue until final disposition of the underlying claim against the insured.  In this regard, we agree with the *Larraburu* court that the final disposition of the case against the insured is critical evidence, though not in and of itself determinative, of whether the insurer's refusal to settle within the policy limits was un reasonable.  *See* [*Larraburu Bros. v. Royal Indem. Co.*, 604 F.2d 1208, 1214-15 (9th Cir. 1979).]  Thus, until final disposition of the underlying claim, an insured may not know whether he has a "colorable" claim that the insurer's conduct was unreasonable.  *Id.* at 1215.  Nevertheless, the fact "[t]hat [the insured] must await final disposition of the original action to determine whether he has a colorable claim against the insurer does not alter the fact that the conduct alleged to be unreasonable occurred at an earlier stage of the original lawsuit, and that the unreasonable conduct can be a proximate cause of injury before the final disposition as well as after."  *Id.*

Id. at 140 n.20 (emphasis added).  And in more dicta, the court stated that "the existence of an excess judgment is the single most important indicia that an insurer's decision not to settle within the policy limits was unreasonable."  Id. at 141 n.23.  Yet the court acknowledged, in another footnote, that, "[c]onsidering the reality of modern litigation, which can span many years, it is clear to us that injuries such as emotional distress might be inflicted during the time between an insurer's decision not to settle the third-party claim, and the insurer's payment of the excess judgment after its becoming 'final' on appeal."  Id. at 140 n.21.  Then, in contrast to its earlier statement concerning final disposition, the court points out that, "in accordance with existing Utah law, our decision reinforces a policy of giving an insurer every incentive to treat the insured properly in the first instance, rather than encouraging a belated attempt to right a previous wrong by paying an excess judgment which should never have come into existence."  Id. at 140-41

(emphasis added).

The court does not read Campbell I as the insurers read it.  The statements in the footnotes, in addition to being dicta, do not expressly say, as American and Continental would have the court believe, that a trial on the merits is a prerequisite to a bad faith claim.  The appellate court rightly recognized that an actual judgment in excess of policy limits would likely be the best indication of the insured's damages, but the Campbell I court did not establish the rule the insurers cite it for.  Accordingly, the court looks to other jurisdictions as well to determine how the Utah Supreme Court would hold.

          d.      The Law in Other Jurisdictions

Other jurisdictions, in well-reasoned opinions, have rejected the very argument the insurers make here.

For example, the Supreme Court of Wyoming, which like Utah characterizes a bad faith claim in the third-party insurance context as a tort, has addressed the same issue the court faces here.  The court in Gainsco Ins. Co. v. Amoco Prod. Co., 53 P.3d 1051 (Wyo. 2002), presented the issue as follows: "where a judgment in excess of policy limits has resulted from a settlement between the insured and the claimant rather than from a trial, and as part of that settlement the insured is insulated by a covenant not to execute or similar device, may the claimant, as the insured's assignee, pursue a third-party bad faith claim against the insurer?"  Id. at 1059.  The court answered in the affirmative, and noted that "[t]he insurer is adequately protected by the requirement that such settlements be reasonable and by its ability to raise the issues of fraud and collusion."  Id. at 1061.  See also Crawford v. Infinity Ins. Co., 139 F. Supp. 2d 1226, 1229-32 (D. Wyo. 2001) (applying Wyoming law and citing other jurisdictions in support, district court

held that court would not enforce policy's "no action" clause "if [the insurer] in fact committed third party bad faith or breached the duty to defend" and stated that insurer's "attempt to require an outright *refusal* to defend as a prerequisite to a finding of bad faith would result in a misinterpretation of Wyoming law") (emphasis in original).

Illinois has reached the same conclusion. See, e.g., National Union Fire Ins. Co. of Pittsburgh, PA v. Continental Ill. Corp., 673 F. Supp 267 (N.D. Ill. 1987) (holding that adverse judgment at trial was not precondition to suit for breach of duty to settle within policy limits in light of potential excess judgment). The National Union court reasoned that

> claims in excess of policy limits force an insured to gamble with its own money. And so long as the insured cannot look to the insurer for that excess amount without proving the insurer's negligence or bad faith, the insured has ample incentive to be reasonable in negotiating settlements itself–for it will be out of pocket if it cannot sustain its burden of proof. . . . [A]ll the courts that have considered the question have allowed insureds (1) to effect reasonable settlements on their own after their insurers have breached their duty to settle and (2) to enforce those settlements against the insurers if reasonable and made in good faith[.]

Id. at 274.

The Supreme Court of New Jersey, on facts similar to the ones here, rejected the insurer's argument that, even in a bad faith case, it was entitled to rely on a "no action" clause and consent requirement in the policy. Fireman's Fund Ins. Co. v. Security Ins. Co. of Hartford, 367 A.2d 864, 867 (N.J. 1976). The court in Fireman's Fund expressly held that if, at the time the settlement offer is received,

> the potential loss and the proposed settlement exceed . . . the limits of the policy, . . . the insured may, but he need not await the outcome of the trial of the negligence action. . . . He should be and is permitted, as in other cases in which the insurer has breached its obligations, to proceed to make a prudent good faith settlement for an amount in excess of the policy limits and then, upon proof of the

28

breach of the insurer's obligation and the reasonableness and good faith of the
settlement made, to recover the amount of the policy limits from the insurer.

Id. at 870.  The authors of the insurance treatise Couch on Insurance approvingly cited Fireman's

Fund for the same proposition:

> When a potential award against an insured was far in excess of policy limits, the
> plaintiffs in a malpractice action offered to settle for an amount greater than the
> policy limit but much less than the amount of their potential recovery, and the
> insured reasonably concluded that the settlement offer should be accepted, the
> insurer was acting in bad faith by refusing to contribute its policy limits to the
> settlement, and the insurer forfeited its right to control the settlement when it
> violated its own implied contractual obligation to exercise good faith in
> considering the offer to settle for an amount in excess of its own policy limit. . . .
> Faced with this situation, the insured should control the defense, settle the case,
> and seek recovery from the insurer of the policy limits and appropriate
> extracontractual damages.

Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 206:39 (emphasis added).

And the Supreme Court of Washington has recognized that a trial on the merits is not

necessary to determine whether a settlement was reasonable.

> We have long recognized if an insurer acts in bad faith by refusing to effect a
> settlement for a small sum, an insured can recover from the insurer the amount of
> a judgment rendered against the insured, even if the judgment exceeds contractual
> policy limits.  This is the majority rule in the United States.  The same rule applies
> when an insured settles in similar circumstances.  An insured may independently
> negotiate a settlement if the insurer refuses in bad faith to settle a claim.  In such a
> case, the insurer is liable for the settlement to the extent the settlement is
> reasonable and paid in good faith.

Besel v. Viking Ins. Co. of Wisc., 49 P.3d 887, 890 (Wash. 2002) (en banc) (internal citations

omitted) (emphasis added).

        e.      The Risk of Collusive Settlements

In general, courts recognize the importance of protecting insurers against collusive

settlements.  In Gibbs M. Smith, Inc. v. U.S. Fidelity & Guaranty Co., 949 P.2d 337 (Utah 1997),

the Utah Supreme Court noted that a liability policy provision, which stated that the insurer was not obligated to pay damages unless such damages were determined in a suit on the merits or in a settlement to which the insurer agreed, "properly functions <u>not to bar coverage but to protect the insurance company against the danger of collusive settlements</u> between the insured and a third party." <u>Id.</u> at 344 (emphasis added). But the majority of those that have considered the effect of a "no action" provision on a bad faith claim seem to strike a balance between the interests of the insured and the interests of the insurer. They have rejected a bright line rule requiring that an insured who settles in violation of a "no action" or voluntary payment provision must always go to trial before a bad faith claim accrues. <u>See also</u> Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 206:3 (3d ed. 2008) ("Not surprisingly, [when an insurer breaches its duty to reasonably settle within policy limits,] the courts generally opt for the cost-efficient option of allowing the insured to settle, assuming that there is no collusion or other impropriety, and sue the insurer for any excess judgment, rather than requiring that the insured sit by while the third-party claimant pursues its action to completion in a court of law. . . . This presumes the risk of a verdict in excess of the policy limits.").

A judgment after trial certainly is good evidence of damages. But it need not be the only form of evidence a court will accept in a bad faith action against the insurer. Other jurisdictions have described factors to consider and methods available to determine whether the stipulated judgment is reasonable. For example, the Supreme Court of Washington in <u>Besel v. Viking Ins. Co. of Wisc.</u>, 49 P.3d 887 (Wash. 2002) (en banc), fashioned a list of criteria:

> Because a covenant not to execute raises the specter of collusive or fraudulent settlements, the limitation on an insurer's liability for settlement amounts is all the more important. A carrier is liable only for reasonable settlements that are paid in

30

good faith.  We have identified various factors to guide the determination of whether a settlement agreement involving multiple defendants and contributory fault is reasonable.  These factors are:

> [T]he releasing person's damages; the merits of the releasing person's liability theory; the merits of the released person's defense theory; the released person's relative faults; the risks and expenses of continued litigation; the released person's ability to pay; any evidence of bad faith, collusion, or fraud; the extent of the releasing person's investigation and preparation of the case; and the interests of the parties not being released.

Id. at 891 (quoting Glover v. Tacoma Gen. Hosp., 658 P.2d 1230 (Wash. 1983)) (internal citations omitted).  See also Mutual of Enumclaw Ins. Co. v. Dan Paulson Constr., Inc., 169 P.3d 1, 13 n.21 (Wash. 2007) (en banc) (citing Besel to re-emphasize factors to consider when assessing reasonableness of confessed judgment).

### f.    Predicting How Utah Courts Would Hold

Although Campbell I appears to be the case most pertinent to the issue here, that decision is filled with arguably contradictory statements, many of which are dicta.  It is also not a decision of the Utah Supreme Court, so it does not have as much precedential weight.

The court is not convinced that the "view" expressed in footnotes in Campbell I is the view that the Utah Supreme Court would adopt if faced with the issue here.  Rather, the policy favoring incentives to insurers to settle in good faith, and the Utah Supreme Court's clear concern with the financial and emotional suffering an insured may endure if forced to go to trial, both suggest that the Utah Supreme Court would extend the rule articulated in Benjamin and Gibbs M. Smith to the analogous situation here.  See Benjamin v. Amica Mut. Ins. Co., 140 P.3d 1210, 1216 (Utah 2006) (holding that insurer's breach of the duty to defend estopped the insurer from "second-guessing [the insured's] decision to settle"); Gibbs M. Smith, Inc. v. United States

31

Fidelity & Guaranty Co., 949 P.2d 337 (Utah 1997) (holding in third-party context, that insured who settled suit without consent of insurer after insurer repudiated coverage and denied any duty to defend, did not forfeit right to coverage despite consent and legal action provisions in policy).

Breach of the duty to defend and a repudiation of coverage is arguably more extreme conduct, but the duty to accept reasonable settlement offers within policy limits when faced with the significant likelihood of an excess judgment (and potential punitive damage liability for the insured) is an extension of that duty to defend.  See Isadore Rosen & Sons, Inc. v. Security Mut. Ins. Co., 291 N.E.2d 380, 382 (N.Y. 1972) (holding that, in addition to breach of duty to defend, "an insurer's obligation to act in good faith for the insured's interest may be breached . . . by failure to act protectively when the insured is compelled to make settlement at his peril[.]"). Moreover, most of the courts that have faced this issue have rejected the proposition that a "no action" provision and voluntary payment provision may be used by an insurance company accused of bad faith to avoid liability for gambling with the insured's (and excess insurer's) money.

For these reasons, the court predicts that if the Utah Supreme Court were to face the issue here, it would hold that an insured facing the significant likelihood of an excess judgment is not required to take the case to trial before a cause of action for bad faith accrues.   Accordingly, that is what this court holds.

g.     Judgment In Excess of Policy Limits

American and Continental incorrectly contend that even if the court finds potential liability, their liability as a matter of law is limited to the amount actually paid by the parties above their deductible or in response to other insurance obligations.

In Utah, an insurer who breaches its fiduciary duty to the insured may be liable for a judgment in excess of the policy limits.  Campbell I, 840 P.2d at 139-40; Beck, 701 P.2d at 801 ("[T]here is no reason to limit damages recoverable for breach of a duty to investigate, bargain, and settle claims in good faith to the amount specified in the insurance policy.").

Moreover, a covenant not to enforce the excess judgment does not nullify the claims against the insurers.  Christiansen v. Holiday Rent-A-Car, 845 P.2d 1316, 1322 (Utah Ct. App. 1992) (holding that settlement agreement's covenant not to execute judgment did not immunize an insurer from liability);  Ammerman v. Farmers Ins. Exch. (Ammerman II), 450 P.2d 460, 461-62 (Utah 1969) (rejecting insurer's argument that insured had no claim because he had not been harmed (i.e., he had entered into an oral agreement with the third party who agreed to refrain from executing the judgment against the insured) and holding that non-payment of judgment did not preclude insured's bad faith claim).  See also Besel v. Viking Ins. Co. of Wisc., 49 P.3d 887, 891 (Wash. 2002) (en banc) ("Washington courts have properly recognized that a covenant not to execute coupled with an assignment and settlement agreement is not a release permitting the insurer to escape its obligation.") (internal quotation marks and citations omitted).

And, similarly, if a judgment is not paid in full, the insured (or its assignee) may still look to the insurer to recover.  Christiansen, 845 P.2d at 1322; Ammerman II at 462.  The court in Ammerman II stated, "We are cognizant of the several cases which hold that there must be a prepayment by the insured before he can maintain an action against his insurer for the excess judgment.  However, we are of the opinion that the cases to the contrary (and perhaps the majority) are the better reasoned."  Ammerman II at 462.  The Ammerman II court then quoted a case in which the Supreme Court of Pennsylvania ruled that prepayment was not a prerequisite to

a cause of action:

> "Three very sound reasons justify the adoption of this 'non-payment' view: (1) such view prevents an insurer from benefitting from the impecuniousness of an insured who has a meritorious claim but cannot first pay the judgment imposed upon him; (2) such view negates the possibility that the insurer would be . . . less responsive to its trust duties where the insured is able to pay the excess judgment. Were payment the rule, an insurer with an insolvent insured could unreasonably refuse to settle, for, at worst, it would only be liable for the amount specified the policy.  To permit this would be to impair the usefulness of insurance for the poor man; (3) such view recognizes that the fact of entry of the judgment itself against the insured constitutes a real damage to him because of the potential harm to his credit rating."

Id. (internal quotation marks and citations omitted) (emphasis added).  See also Campbell I at

142 ("[T]he agreement insulating [the insured] from liability for payment of the judgment does

not cure the alleged bad faith conduct of [the insurer]. . . . [and] does not necessarily vitiate [the

insured's] cause of action.").

Given all of the above, the court finds that Utah court decisions do not bar the Rupps'

claims as a matter of law or limit the damages to the amounts suggested by the insurers.

> h.    Was there bad faith on part of the insurers?

The question of whether the insurers acted in bad faith "turns on factual issues to be

determined by a jury after consideration of all the evidence."  Campbell I at 132.  The court finds

there are genuine disputes of material fact regarding whether the insurer acted in bad faith.

For instance, the initial view of CNA Claim Plus was consistent with what five out of six

legal experts concluded — that a significant verdict was a real risk.  And the authors of those five

opinions universally recommended settlement based on what they predicted would be a

significant verdict and a possible punitive damage award, given the severity of Ms. Rupp's

injuries and their assessment of her attorney's mode of operation during trial.  The sixth opinion,

34

submitted by out-of-state attorney, Mr. Dawson, was "premised on the assumption [that he] would be lead trial counsel."  (Ex. 2 to Brenkman Aff.)  CNA Claim Plus, on behalf of American and Continental, chose to adopt Mr. Dawson's view that the case's settlement value was less than $2 million.

Another problematic fact is that American and Continental had two opportunities to settle within the combined $4 million policy limits, but refused to do so despite the majority of legal experts' thorough evaluations strongly urging settlement in excess of the $1.5 to $2 million the insurers were offering.  The rejected settlement offers even contained an agreement that the plaintiffs would not pursue punitive damages against Granite of Utah.

In short, the court cannot say, given the circumstances set forth in the record, that a reasonable jury could not find that the insurers breached their fiduciary duties.

                    i.    <u>Were the Settlement Agreement and Stipulated Judgment collusive or entered in bad faith?</u>

The court also finds that there are genuine disputes of material fact regarding whether the settlement and stipulated judgment were "secret and collusive" or entered in bad faith.  While it is true that American and Continental did not know about the final settlement agreement, they were fully informed of the repeated settlement offers, the various opinions evaluating the case (including Westchester's letter urging settlement and its offer to contribute $2 million towards settlement).  Granite and Granite of Utah clearly stated their belief that the insurers had breached their duties and that Granite would do what it needed to do to protect itself and its subsidiary. The opinion letters raised sufficient concerns about the significant financial liability Granite risked if it went to trial.

35

Given the evidence presented by the Plaintiffs, the court cannot say that a reasonable jury could only find that the Settlement Agreement and Stipulated Judgment were secret, collusive, and entered in bad faith.  Accordingly, the court is precluded from entering summary judgment in favor of American and Continental.

### 3.    Westchester's Claim and the Doctrine of Equitable Subrogation

The Rupps, as assignees of Westchester, apparently bring a claim of equitable subrogation against American and Continental.  Utah law recognizes a claim for equitable subrogation by an excess insurer against a primary insurer arising out of the excess insurer's payment of a claim to the insured or a third-party on behalf of the insured.

> Subrogation is an equitable doctrine that allows a person or entity which pays the loss or satisfies the claim of another under a legally cognizable obligation or interest to step into the shoes of the other person and assert that person's rights. The right to subrogation does not depend on contractual relationships, as its purpose is to work out an equitable adjustment between the parties by securing the ultimate discharge of a debt by the person who, in equity and in good conscience, ought to pay it.

State Farm Mut. Auto. Ins. Co. v. Northwestern Nat'l Ins. Co., 912 P.2d 983, 985 (Utah 1996) (internal quotations and citations omitted).  Relief is available if the following conditions are met:

> (1) There must be a debt or obligation for which the subrogee [here, excess carrier Westchester] was not primarily liable; (2) the subrogee must have made payment to protect his own rights or interest; (3) the subrogee must not have acted merely as a volunteer; and (4) the entire debt must have been paid.   Furthermore, subrogation must not work any injustice to the rights of others.

Id. at 986 (internal citations omitted).

Here, the first condition is met.  Granite of Utah owed a debt to the Rupps based on the Settlement Agreement.  Westchester participated in that settlement and took responsibility for

some of that debt, but the parties primarily liable for that debt—American and Continental, the primary and umbrella insurers—did not contribute anything.

The second and third conditions have also been satisfied.  The record shows that Westchester made payment under the Settlement Agreement to protect its own interest, because it believed it had an obligation to its insured for what it anticipated would be an excess judgment if the underlying action had gone to trial.   And there is no indication that Westchester acted as a volunteer.  A subrogee does not act as a volunteer if the payment was "made with a reasonable or good faith belief in an obligation or personal interest in making that payment.  This standard is met when an insurer has acted 'in good faith to discharge a disputed obligation . . . [even] if it is ultimately determined that its policy did not apply.'"  Northwestern Nat'l Ins. Co., 912 P.2d at 986.  Westchester clearly analyzed the situation and believed it would be required to cover an inevitable excess judgment if the case went to trial.  "Parties who pay a debt in self-protection, to avoid suffering a loss if the obligation is not discharged, are exercising their right of subrogation and are not volunteers."  Galen Health Care, Inc. v. American Cas. Co. of Reading, PA, 913 F. Supp. 1525, 1531 (M.D. Fla. 1996).

Finally, it appears undisputed that the fourth condition—that the entire debt has been paid—has been met.  Westchester apparently paid $2.3 million to the Rupps as part of the terms of the Settlement Agreement.

Westchester's assignment was not premature (and so not a nullity).  Westchester was entitled to bring a claim for equitable subrogation at the time of assignment because a claim for breach of the duty to settle in good faith had arisen at that time.  Moreover, Westchester's claim does not fail as a matter of law for the same reasons that Granite of Utah's claims do not fail as a

matter of law, because Westchester (or its assignee), in pursuing an equitable subrogation claim, stands in the shoes of Granite and Granite of Utah.  <u>Northwestern Nat'l Ins. Co.</u>, 912 P.2d at 986; <u>Twin City Fire Ins. Co. v. Country Mut. Ins. Co.</u>, 23 F.3d 1175, 1179 (7th Cir. 1994). Accordingly, the Rupps have valid claims that should not be dismissed on summary judgment.

<b>ORDER</b>

For the foregoing reasons, the court ORDERS as follows:

1.      As the court ruled from the bench during the September 18, 2008 motion hearing, Defendant Insurers' Motion to Strike the Affidavit of Paul Brenkman (Doc. No. 100) is GRANTED IN PART AND DENIED IN PART.  That is, all but the first sentence of Paragraph 4, and Paragraphs 5 and 6 of the affidavit are stricken, but the remaining portions and the attached documents are not stricken from the record.

2.      As the court ruled from the bench during the September 18, 2008 motion hearing, Transcontinental Insurance Company's and CNA Insurance Company Limited's Motion to Dismiss (Doc. No. 27) is GRANTED.  Accordingly, all of Plaintiffs' claims against Transcontinental and CNA are DISMISSED WITHOUT PREJUDICE.

3.      Defendant Insurers' Motion for Summary Judgment (Doc. No. 74) is DENIED.

DATED this 17th day of November, 2008.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
Chief Judge